## US DISTRICT COURT FOR THE NORTHERN DISTRICT OF ~~GEORGIA~~

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 1 4 2025

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

| | | |
|---|---|---|
| Tracie M. Soucie (Pro Se), | ) | Civil Action No: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND OTHER RELIEF** |
| Piedmont Healthcare, Inc., and | ) | |
| James Davies, individual, | ) | **1:25-CV- 4595** |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | | |

Tracie M. Soucie ("Plaintiff") files this *pro se* Complaint against Defendant, Piedmont Healthcare, Inc, and James Davies, in his individual and official capacity as her supervisor while she was employed at Piedmont Heathcare Inc, at the Covington, GA facility during all the events alleged in the Complaint. Plaintiff respectfully shows this Court as follows:

### INTRODUCTION

1. This action is for sexual harassment and retaliation arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e, et seq. ("Title VII"), and related state-law claims. Plaintiff seeks compensatory damages, punitive damages, and liquidated damages.

### JURISDICTION AND VENUE

2. Plaintiff's Title VII claims present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3).

3. Plaintiff further invokes pendant jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under the laws of the State of Georgia for assault, battery, negligent supervision, and negligent retention.

4. Venue is appropriate in this Court as upon information and belief the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and upon information and belief all parties to this action

reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES, JURISDICTION, AND VENUE

5.  Tracie M. Soucie, is the Plaintiff and proceeding *pro se*. Plaintiff is an individual and resident of Newton County, Georgia. She will refer to herself in the 3rd person as "Plaintiff" in Complaint and these proceedings.

6.  During the events that form the basis for her cause of action, Tracie M. Soucie, was the Practice Manager for the Gastro-Enterology Clinic located at Piedmont (Newton), 4181 Hospital Dr NE Suite 202, Covington, GA 30014 from March 2022 to November 22, 2024

7.  Defendant Piedmont Healthcare, Inc. ("EHC") is a Georgia Domestic Non-Profit Corporation with its Principal Office address of 1800 Howell Mill Road, Suite 850, Atlanta, GA 30318. Defendant may be served at CSC of Cobb County, Inc., 192 Anderson Street, N.E. Suite 125, Marietta, Georgia 30060 which is the address of Defendant's Georgia Registered Agent.

8.  This Complaint includes actions for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e *et seq.* ("Title VII"), to recover for discrimination based on race, sex, gender, age, and retaliation. This Court has original jurisdiction over these claims under 28 USC §1331.

9.  Plaintiff asserted claims of discrimination against EHC based on race, harassment based on race, sex, gender, age, and retaliation under Title VII in a filing with the Equal Employment Opportunity Commission ("EEOC") within 180 days of EHC's last discriminatory act.

10. On May 16, 2025, the EEOC issued a Notice of Right to Sue less than ninety days prior to the filing of Plaintiff's initial Complaint. A true and correct copy of the EEOC's letter is attached hereto as Exhibit 1.

11. Plaintiff is demanding a jury trial and in support of my causes of action allege as follows:

## COUNT 1 – DISCRIMINATION IN VIOLATION OF CIVIL RIGHTS

### Plaintiff's background and employment under James Davies

12. Plaintiff is an African American female citizen of the United States with a date of birth of August 14, 1965.

13. Defendant, Piedmont Healthcare, Inc. is Georgia Domestic Non-Profit Corporation with its central office in Atlanta, Georgia.

14. As relevant to this action, Defendant has Georgia hospitals and medical facilities at:

   a. Piedmont (Gastro – Newton)  4181 Hospital Dr NE Ste 202, Covington, GA 30014
   a. Piedmont (Fayetteville) 1255 Hwy 54 W, Fayetteville, GA 30214
   b. Piedmont (Gastro - Rockdale) 1301 Sigman Rd NE Suite 170, Conyers, GA 30012
   c. Piedmont (Hospital - Rockdale) 1412 Milstead Ave, Conyers, GA 30012

15. During Plaintiff's hiring and tenure at Piedmont (Gastro-Newton), Plaintiff's direct supervisor was James Davies, a white male, 69-70 yrs of age.

16. US Census data shows Newton County to be 52.9% black and 38.1% white (non-Hispanic or Latino) and 52.9% females. Without consideration of experience and education, the selection "pool" for employees would be primarily minorities, females, and between the ages of 35 to 60 year of age.

17. Mr. Davies has a documented history of "bullying" female employees during his tenure at Piedmont-Newton. These facts are confirmed and admitted by Defendant's counsel in response to Plaintiff's EEO Complaint as well as admitted by Piedmont Newton HR personnel, Ms. Melissa Ragland, directly to Plaintiff.

18. Mr. Davies had a pattern of selecting persons whom he would supervise that he believed would submit to his bullying behavior without complaint. For historic, economic, and social reasons minority females might be more tolerant of his behavior.

## FACTS REGARDING PLAINTIFF'S EXPERIENCE AND HIRING FOR THE PRACTICE MANAGER AT PIEDMONT NEWTON GASTRO-ENTEROLOGY (NEWTON)

19. Before applying for the Practice Manger position at Piedmont (Gastro – Newton), Plaintiff had extensive experience in the medical services field, including Arthritis Center, Lincoln, NE (9/2003 to 1/2007), Nebraska Heart Hospital (1/2007-12/2011), Piedmont Gastro-Enterology – Rockdale (3/2015-6/2022). During all prior medical employment Plaintiff had direct and frequent contact with patients and the medical providers.

20. While at Piedmont (Gastro- Rockdale) (3/2015-6/2022), Plaintiff worked with Dr. Ekinades Aburime for 4 years. Dr. Aburime is now Chief of Gastroenterology at Piedmont (Rockdale).

21. Dr. Aburime strongly recommended Plaintiff for the Practice Manager position to manage the creation and then manage of the Piedmont (Gastro – Newton) –in Covington, GA that was not yet in existence.

22. Piedmont (Gastro – Newton) wasn't in operation when Plaintiff was hired. It was merely a "space" available for renovation in the Knox Medical Center located to the west of the Piedmont (Newton) Hospital in Covington GA.

23. This initial available "space" required that the "reception" area be located across the hall from the "treatment/consultation" area. Before seeing a single patient, these "empty spaces" needed to be turned into a functioning clinic. Support staff needed to be screened, interviewed, and hired. That was Plaintiff's job.

24. The Piedmont (Gastro – Newton) clinic opened its door to patients ON TIME in June 2021. It had a full support staff that Plaintiff interviewed and hired to assist the medical providers.

25. Mr. Davies specifically told Plaintiff during his first employee evaluation that he "*He didn't think [Plaintiff] could pull it off*" at the Knox location.

Page 4

26. During the period from March 2022 to when Plaintiff resigned on November 22, 2025, Mr. Davies repeatedly engaged in abusive and bullying behavior towards Plaintiff.

27. This was not an isolated abusive relationship between Plaintiff and Mr. Davies. Mr. Davies was also abusive and bullying towards other practice managers. Plaintiff later learned that his pattern of conduct was documented and found to have "existed" by Piedmont HR personnel. However, Piedmont did nothing to correct his behaviors under the "*Jim will be Jim*" theory.

28. Plaintiff avoided confronting Mr. Davies directly and knew that complaints to Piedmont HR had proven futile when made by other Practice Managers. Some practice managers just quit to avoid the problems.

29. Plaintiff decided to seek a transfer to another Practice Manager position within Piedmont Medical that would NOT be under Mr. Davies' supervision. Such a transfer in addition to avoiding harassment would be financially beneficial, considering both salary and travel to/from work.

### The Fayetteville PM II position (posting and acceptance)

30. On January 16, 2024, Gwen Harris the manager of hemo/oncology at Piedmont-Rockdale told Plaintiff that Suzette Suarez was looking for a PM II for hemo/oncology at Piedmont (Fayetteville).

31. Plaintiff knew from experience that Gwen Harris would not make such referrals unless Ms. Harris believed the Plaintiff would do an excellent job at the new location.

32. Ms. Harris told Plaintiff to send her resume to Ms. Harris and she would give it to Ms. Suarez.

33. Ms. Harris advised Plaintiff via text message that the job at Piedmont (Fayetteville) would be posted on Thursday (1/18/2024).

34. On January 18, 2024, the Piedmont oncology director, Suzette Suarez, posted an opening for a PM II in Fayetteville, Georgia.

Page 5

35. Plaintiff knew at the time that a PM II position pays significantly more than a PM I which was Plaintiff's position at Piedmont (Gastro) in Covington. This would permit Plaintiff to avoid the persistent issues involving Mr. Davies' bullying management "style" and be a raise in pay.

36. Based, in part, on the encouragement and referral of Gwen Harris and Sierra Anderson, Plaintiff verbally applied for the job at Piedmont (Fayetteville). If Plaintiff was seen as a suitable candidate for the position, Plaintiff would formally apply. If not, then Plaintiff wouldn't apply.

37. Plaintiff took this initial "informal" approach to avoid the wrath of Mr. Davies for being "disloyal" to him personally. If Plaintiff "formally" applied and didn't get the position, then there would be hell to pay with Mr. Davies going forward.

38. Plaintiff knew because of her familiarity with Piedmont personnel procedures that Mr. Davies would get "notice" of Plaintiff's formal application to relocate to a different clinic or hospital.

39. On January 25, 2024, at 10:00 am, Plaintiff met with Suzette Suarez at the hemo/oncology office in Piedmont (Newton) for an informal "in person" interview. Sierra Anderson, a PM II (hemo/oncology) was also present.

40. The hemo/oncology clinic is in the same building and on the same floor as the gastroenterology clinic.

41. Dr. Ndibe, a physician with hemo/oncology, knew Plaintiff very well. Dr. Ndibe recommended to Ms. Suarez that they hire Plaintiff for the position that was listed as a PM II.

42. At 3:26 pm, Plaintiff emailed Ms. Suarez thanking her for the opportunity to discuss the Practice Manager II position at Piedmont (Fayetteville).

43. On January 30, 2024, Plaintiff confirmed through emails with Ms. Suarez that there would be a 2nd "in-person" meeting for Thursday (2/1/24) at Piedmont (Fayetteville). Plaintiff would meet with the attending physician, Dr. Hansra, at the oncology clinic and the other support staff. This meeting was for the Practice Manager II position.

44.    On February 1, 2024, Plaintiff met with Ms. Suarez and Dr. Hansra in Fayetteville for the scheduled interview for the posted PM II position. The interview started at 2:00 pm and lasted until approximately 4:00 pm.

45.    Ms. Suarez also asked Plaintiff to sit in for an interview with an applicant for a front office assistant (FOA) position in Fayetteville.

46.    After this interview, Ms. Suarez asked Plaintiff for her assessment. Plaintiff said that she didn't think the candidate would be a "good fit" for the Fayetteville office and Ms. Suarez agreed.

47.    Ms. Suarez advised Plaintiff to put in my formal application and Ms. Suarez would give Mr. Davies a call on Monday (2/5/24).

48.    Later that same evening at approximately 6:40 pm February 1, 2024, while having dinner at "Franks" in Fayetteville, GA, Plaintiff received a call from Ms. Suarez offering me the position if I made the formal application.

49.    Plaintiff thanked Ms. Suarez very much and said a formal application would be submitted in the morning (2/2/24).

50.    Ms. Suarez said that she sometimes had problems with "comp" when offering her staff a position because "comp" tended to "low ball" the job. Plaintiff was told to submit the requested salary. If "comp" had a different number, Plaintiff should make a counteroffer. The factual allegations set forth above are documented in emails to/from Plaintiff.

51.    On February 2, 2024, Plaintiff submitted her application online at approximately 9:46 am for the "Practice Manager II, Medical Oncology" in Piedmont (Fayetteville). Plaintiff's requested compensation was included in this application.

52.    Plaintiff was advised of receipt of the application by email from the Piedmont "Talent Acquisition Team."

53.    Plaintiff received a 2nd email at 12:35 pm from Talent Acquisition Team stating that the application was sent to the "hiring manager" for additional review.

54. Plaintiff has been a Piedmont (Gastro) Practice Manager since 2021, and was aware that her immediate supervisor, James Davies, would receive an email from Talent Acquisition stating in substance that a *"candidate in your department is being considered for a position within Piedmont Healthcare."* Mr. Davies would be asked to complete an "Internal Reference Form" for the candidate. Plaintiff had done this for her staff members seeking a new job within Piedmont in the past.

55. Plaintiff does not know exactly when Mr. Davies received the Internal Reference Form, but it should have been on Monday afternoon, February 5, 2024, or February 6, 2024, at the latest.

## Piedmont's falsification of Plaintiff's application and aftermath

56. On February 7, 2024 (Wed), Plaintiff received a call from Suzette Suarez who told Plaintiff, *"Are you sitting down?"* Plaintiff was expecting good news from "comp."

57. Ms. Suarez told Plaintiff that Shantrice Acker (Director of HR) called Ms. Suarez and told her the position in Piedmont (Fayetteville) was changed to a PM I.

58. Ms. Suarez said, *"That can't be, it was approved for a PM II."*

59. Plaintiff was told by Ms. Suarez to *"sit tight."* Ms. Suarez would get this fixed and call "Vandy" (Vail-Dickson) (Executive Director of Operations Piedmont Oncology Institute Piedmont Neuroscience).

60. On February 7, 2024, at 11:50 am, Plaintiff received a call that was forward to voice mail. The call was from Jessica Fendley who worked for Piedmont recruiting as their lead talent consultant. She was doing a follow-up to the practice manager position with Fayetteville oncology.

61. Plaintiff returned the phone call to Ms. Fendley who proceeded to tell Plaintiff that the position was changed to PM I, and it would be a "lateral" move.

62. Plaintiff asked, "*What change?*" Plaintiff stated she had been interviewed for and offered a PM II. Plaintiff had been told by Ms. Suarez the Piedmont (Fayetteville) position was already approved for a PM II.

63. Plaintiff was aware that all of Ms. Suarez' managers were PM II, even those that only have one physician.

64. Plaintiff knew that Ms. Suarez had just hired a practice manager in Kennesaw for a PM II position who only had one physician.

65. Plaintiff told Ms. Fendley that she was "*confused*" as she didn't apply for a PM I. Ms. Fendley provided no information regarding the change.

66. On February 7, 2024, Plaintiff received a call from her director James Davies. Plaintiff was in a team meeting with the (Executive) Director of Oncology, Tony Slabacheski.

67. Mr. Davies called Plaintiff's phone twice during this meeting, so Plaintiff assumed it was something important. Plaintiff excused herself from the meeting and called Mr. Davies back.

68. Before Plaintiff could get any words out, Mr. Davies started shouting at Plaintiff.

69. Mr. Davies asked Plaintiff if she had told anybody about Plaintiff leaving Piedmont (Newton – Gastroenterology). Plaintiff said to Mr. Davies, "*What do you mean, if I had told anybody?*" Mr. Davies said, "*Did you tell your staff? Did you tell your doctors? Did you tell anybody?*" Plaintiff replied, "*No, I did not tell my staff or the doctors, because I was waiting to hear back from Comp with the numbers (salary).*"

70. Plaintiff asked Mr. Davies why he was asking this. Mr. Davies got very irritated and said that I didn't tell him about it. Plaintiff told Mr. Davies, "*Well where is it written where I must tell my manager that I applied for a new position within the company.*" His tone was extremely aggressive, and he hung up on Plaintiff.

71. Plaintiff alleges that after having been interviewed for a PM II position, an offer was extended for the PM II position, and after Mr. Davies was advised

Page 9

of the application, on February 7, 2024, the Fayetteville position was downgraded to a PM I.

72. On February 7, 2024, after the events set forth above, Plaintiff logged in to view HER application and without her permission it had been CHANGED by persons unknown within Piedmont to reflect that Plaintiff was applying for a PM I position.

73. To this day, Plaintiff has no idea who fraudulently changed her application for the PM II position to a PM I. Plaintiff would not have applied for or accepted the Fayetteville position at a lessor salary since the drive from home would have been 30 to 40 minutes longer than to the Covington location.

74. On April 25, 2024, at 1:00pm. per Plaintiff's request, she met with James Davies.

   a. For the first five minutes Mr. Davies wanted to talk about some beef jerky that he was eating and had brought.

   b. Plaintiff finally interrupted that conversation and began to talk about how Plaintiff no longer have trust in him or HR, and how Plaintiff was not being properly compensated.

   c. Plaintiff's attempt to move to a published PM II position had been torpedoed.

   d. Mr. Davies proceeded to show Plaintiff a graph with numbers to justify why he couldn't give me a raise. Plaintiff asked for a copy of the graph, he told me that he could not give me a copy.

   e. Plaintiff told Mr. Davies that she knew for a fact that she was the lowest paid manager,

   f. Plaintiff also talked about her accomplishments for the practice, her good relationship with her staff, the providers, physicians, the staff, and the Administrators at Piedmont (Newton).

   g. Mr. Davies told Plaintiff this was a decision based solely on "Comp." Plaintiff told Mr. Davies that she knew that Sierra Anderson had met with him to ask him for a raise, and he told her in a very nasty tone,

that he had "*gifted her*" the PM II position that she had. She should be grateful for the raise. She was very upset about that and when she left, she cried. Mr. Davies said to me, "*She told you about that?*" Plaintiff replied, "*yes she did.*"

h. Mr. Davies told Plaintiff he could not get Plaintiff a raise and Plaintiff said to him, "*Okay, if I left my position today or tomorrow, do you really think you could get someone in here to replace me for the money that you are paying me now?*" His reply, was "*Probably not.*" Plaintiff then said to Mr. Davies, "*Well, I guess this is what it is.*" Mr. Davies then said, "*Hold on, what if I gave you another practice?*" Plaintiff said to him "*That would be fine, but only if he compensated me for both practices.*" Plaintiff left his office and went back to work.

75. Plaintiff alleges that as a matter of Piedmont procedure, her experiences as a practice manager, and conversations with other practice managers within Piedmont, a Practice Manager or a supervisor CANNOT post a position with a specific pay grade (e.g., PM I, PM II, or PM III) without the PRIOR approval of Piedmont Corporate.

76. Plaintiff alleges that the posting of a position, applications, and position offers would all be documented. Although she requested, Plaintiff has not been provided with ANY of this documentation as relates to the Piedmont (Fayetteville) PM II position posting and subsequent change.

77. Plaintiff alleges that she sent notice to Piedmont NOT to destroy, change, or discard any of the internal documents, emails, and other records regarding the posting of the Fayetteville position.

78. Plaintiff alleges that based on her experience that grading a position (classification, salary range) is done by HR personnel BEFORE posting of the job opening. Plaintiff has had first-hand experience with this process when vacancies developed at Gastro-Enterology.

79. Plaintiff has never had HR change the position's classification AFTER posting and, more importantly, AFTER offering the position to an applicant.

Page 11

Upon conversations with other Piedmont Practice Managers, they have never experienced a positions classification being changed after posting.

80. Plaintiff further alleges that when a person who is currently employed at Piedmont is seeking a position at another location within Piedmont, they do NOT need to seek advanced permission to apply for another or better job.

81. Plaintiff further alleges that the process within Piedmont is that the new hiring manager will send an email to the applicant's current supervisor, asking about the individual's qualifications etc. Plaintiff has been in that situation with some of her staff, has given an honest assessment, and wishes them well.

82. Plaintiff has sought pre-litigation access to the Piedmont documentation of the Fayetteville PM II posting, Plaintiff's application, acceptance, and offer, and involvement of Mr. Davies and the classification change. Plaintiff received zero documents during the mandatory EEOC proceedings.

## EEOC PROCEEDING AND DEFENDANT'S MISREPRESENTATIONS AND ALLEGATIONS OF FACTS IN SUPPORT OF RELIEF

83. Plaintiff filed a timely formal EEOC Complaint based on the actions set forth above.

84. In a letter dated January 3, 2025, Mr. Joshua M. Lott, Corporate Counsel for Piedmont submitted a letter to EEOC Investigator Tran with 3 attachments and included the following threat/disclaimer that their "OFFICIAL" response was "strictly confidential" and can't be "disseminated" without Piedmont's "written approval." Mr. Lott's letter on behalf of Piedmont closed with the following:

> "This response, while believed to be accurate, **does not constitute an affidavit or a binding statement of Piedmont's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the Charging Party's allegations.**

Because additional facts likely would be uncovered through discovery or following a full investigation, Piedmont in no way waives its right to present new or additional information." (Emphasis added.)

85. On May 17, 2024, Plaintiff sent Piedmont Healthcare a "notice to preserve documents".

86. Although Piedmont's representative, Mr. Lott, did not identify the women who were subject to bullying, Plaintiff is aware of some of them. Some no longer work for Piedmont and have taken other positions.

87. Plaintiff remains concerned that Piedmont may take retaliatory action against current (and former) practice managers, as well as my former staff at Piedmont (Gastro – Newton). Piedmont's published policies and their actions are not always the same.

88. Plaintiff alleges that to the best of her knowledge Mr. Lott's non-response to the factual allegations was based either on Piedmont withholding information of the facts from Mr. Lott, or Mr. Lott was deliberately misrepresenting his actual knowledge of the facts before the EEOC.

89. Plaintiff alleges that the entirety of the PIEDMONT investigation into which she has been made privy appears to have been delegated to Ms. Ragland. Ms. Ragland's contacts with Plaintiff were extremely limited and were as follows:

    a. On May 2, 2024, Plaintiff received an email from Ms. Ragland requesting a personal meeting.

    b. On May 2, 2024, Plaintiff returned her call requesting an "in person" meeting with her, but she said that would be difficult. We might need to do a ZOOM meeting.

    c. Ms. Ragland confirmed to Plaintiff that she had information about "bullying" by Mr. Davies. Plaintiff inquired about where she got her information because it confirmed something Plaintiff knew from other managers, some of whom quit because of his bullying.

    d. Plaintiff told Ms. Ragland about how Mr. Davies had blocked the PM II position in Fayetteville.

 e. On May 7, 2024, Plaintiff had a second conversation with Ms. Ragland elaborated on the fact that Mr. Davies was a bully and named the other managers who had left because of his behavior. Plaintiff provided Ms. Ragland with the sequence of events regarding the posting and acceptance of the position discussed *ante.*

 f. Plaintiff was concerned about full disclosure to Piedmont HR to correct the situation. It was common knowledge, that Mr. Davies would brag to Plaintiff and other Practice Managers that he had "*HR in his pocket.*"

90. This May 7, 2024, phone conversation referenced above was the last direct communication between Plaintiff and Ms. Ragland.

91. On May 17, 2024, Plaintiff sent a "preservation" letter to Ms. Ragland.

92. Plaintiff later learned that Ms. Ragland, or someone on her behalf, was able to delete a message to Plaintiff from her.

93. Plaintiff was able to recover the email and sent Ms. Ragland a detailed email message on June 10, 2024, as follows:

> "I was able to recover the missing email that we discussed. I was unaware that emails could be "recalled" by the sender within Piedmont. To be clear, my preservation letter would also cover emails within Piedmont that were sent and then "recalled." I find it extremely odd that a sender within Piedmont could email someone within Piedmont, then recall that email so that it would appear [as if] it never existed. I am trying to determine the compensation metrics used by Piedmont that are equitable, competitive, consistent, and communicated to employees. I have decades of experience in the heathcare field involving practices devoted to heart problems, arthritis, and immune disorders, as well as gastro-enterology within Piedmont. Could you please provide me with the following documents:

#1 - The Piedmont rules, regulations, or guidelines used to determine whether a position is a PM I, PM II, or PM III. I assume this should be related to profitability of clinic, number providers, number of staff, number of client/patients per day, week, or month, number of additional procedures to be scheduled, etc. I could be wrong and would prefer to have an accurate understanding as to how my compensation is determined. Certainly I want to know to what extent race, sex, and age play into the calculations.

#2 - The Piedmont rules, regulations, or guidelines used to determine the salary range for person hired as a PM I, PM II, and PM III. Again, I assume this should have some relationship to experience, provider satisfaction with management of the client, patient/client satisfaction with services rendered, and the overall profitability of the clinic (perhaps in comparison to other clinics).

#3 - I would specifically request a copy of the "chart" that Mr. Davies prepared and showed me on April 25, 2024. Obviously, Mr. Davies was working with some sort of compensation guidance, whether of his own creation or from Piedmont. I would like to know if the metrics in his chart conform to the rules, regulations, or guidelines applicable to Piedmont's compensation practices at Newton and other locations. I would note that at this meeting, Mr. Davies told me he had no involvement in determining a job classification. I was previously "cc'ed" an email from Mr. Davies where he was doing exactly that and downgrading an existing position to one of lessor compensation.

#4 - I have been contacted by two former Piedmont practice managers who have attempted to call you and haven't received a response. They asked me to reach out to you. If you want to hear

Page 15

from them, please advise and I will get their permission to give you their contact information. I am sure you are aware that I am on a "clock" to determine exactly what happened on Feb 2-7, 2024, and the subsequent events regarding my compensation. Thank you for your attention to this matter."

94. Ms. Ragland did not respond to Plaintiff's email.

95. Plaintiff alleges that neither Ms. Ragland nor any other Piedmont staff had any contact with these two individuals Plaintiff named, nor anyone else with direct knowledge regarding changing the Fayetteville position.

96. Piedmont has provided Plaintiff with NO DOCUMENTATION regarding the initial evaluation of the (Piedmont-Fayetteville) PM II position.

97. Piedmont has provided NO DOCUMENTATION as to why it was "downgraded" until AFTER it was offered to Plaintiff and Plaintiff made formal application.

98. Plaintiff resigned from her position at Piedmont effective November 22, 2024, and the reasons included the following:

   a. Plaintiff had an employee under her supervision who repeatedly disregarding instructions and policies by changing notes in charts without permission. This action interfered with the processing of patients for assignments to treatment rooms. Her actions were not only improper but continued with a pattern of failure to follow protocol.

   b. HR overruled Plaintiff's request to terminate the employee and was directed to just "write her up," which Plaintiff did. Plaintiff knew it would be meaningless in her changing her behavior.

   c. Piedmont HR would not follow Plaintiff's recommendation and request, then it was time to go. Plaintiff had no future for advancement within the Piedmont organization.

99.  Plaintiff sought, in good faith, to mediate with Piedmont while her complaint was pending before the EEOC. However, Piedmont rebuffed all attempts at mediation which is why this Complaint was filed.

## COUNT I

### TITLE VII DISCRIMINATION ON THE BASIS OF RACE & SEX

100.  Plaintiff incorporates herein the allegations set forth in Paragraphs 1-99 of this Complaint.

101.  As an African American, Plaintiff is in a class protected by Title VII from adverse employment actions based on her race.

102.  Plaintiff would have received approximately $20,000 to $30,000 per year in salary increase as a PM II at the Piedmont (Fayetteville) with only a minor increase in travel time to/from home. This increase in salary would have been available until Plaintiff retired at age 67 and would amount to between $140,000 to $240,000.

103.  Plaintiff's lifetime earnings have been reduced because of Defendant's actions. Plaintiff is entitled to an award of damages equal to the amount of his resulting lifetime earnings loss.

104.  Defendant's conduct was willful or with conscious indifference to the consequences, and for this reason support an award of punitive damages pursuant to Title VII.

### COUNT II (ABUSE OF PROCESS – State law)

105.  Plaintiff incorporates herein the allegations set forth in Paragraphs 1-99 of this Complaint.

106.  Plaintiff alleges that the actions, omissions, and false representation by counsel for Piedmont denied her a meaningful hearing before the EEOC. Plaintiff sought to mediate this dispute. Defendants have given Plaintiff no other option but to bring this litigation.

WHEREFORE, Plaintiff prays for Judgment against Piedmont Heathcare and James Davies under Count I and II as follows:

a. Compensatory damages in an amount to be determined at trial;

b. Front pay and back pay in an amount to be determined at trial;

c. Punitive damages pursuant to Title VII; and

d. Such other and further relief as the Court deems appropriate.


Respectfully submitted:


Tracie M. Soucie
35 Rosemont Parkway
Covington, GA 30016
Ph. (402) 429-2145
Email: Tradog814@gmail.com


## ATTACHMENTS

Attachment 1: EEOC "right to sue" letter via email dated May 16, 2025



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/16/2025

**To:** Tracie M. Soucie
35 Rosemont Parkway
Covington, GA 30016
Charge No: 410-2024-10730

EEOC Representative and email:      Garica Walker
Investigator
garica.walker@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 410-2024-10730.

On behalf of the Commission,

Digitally Signed By:Darrell E. Graham
05/16/2025
Darrell E. Graham
District Director

ATTACHMENT "1" (4 pages)

Cc:
Joshua M. Lott
Piedmont Healthcare, Inc.
2727 Paces Ferry Rd SE, STE 1-100
Atlanta, GA 30339

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2024-10730 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2024-10730 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.